BENJAMIN WILLIAMSON, trustee,

*v.*

THE NEW JERSEY SOUTHERN RAILROAD COMPANY and others.

1. As between a mortgagee and an execution creditor, rolling stock of a railroad company mortgaged with the railroad is part of the realty.

2. Where the rolling stock is mortgaged with the road and is fixtures necessary to the operation of the road, the necessity which exists to use it in order to use the real estate itself, the peculiar connection between the rolling stock and the road, are themselves—if it be conceded that such stock is personal property—sufficient reasons for holding that the provision of the act concerning mortgages, requiring immediate delivery and continued possession of chattels mortgaged, or filing instead thereof, is inapplicable to such mortgages.

3. The fact that the mortgagee of chattels had taken possession of them under his mortgage, before the judgment creditor recovered his judgment, will not give validity to the mortgage as against the latter if the mortgage was not filed according to the provision of the act concerning mortgages, and there were not immediate delivery and continued possession of the goods according to the provision referred to.

Williamson *v.* N. J. Southern Railway Co.

4. Where, on a sale of chattels, the delivery of security for the price was to be simultaneous with the delivery of the goods, and by fraud the vendor was induced to accept a worthless security instead of the valuable one for which he had stipulated, and he had not waived his right to the security to which, by the contract, he was entitled, *Held*, that he might rescind the contract of sale at any time after discovery of the fraud, no innocent third party having become interested in the property before he gave notice of his intention to rescind, and it not appearing that any injustice would be done to the wrong-doer by allowing the rescission.

5. Where a mechanic's lien claim for contract work and materials stated that the work and materials were done and furnished "within a year past," and the bill of particulars sufficiently particularized the amount and kind of labor and materials, stating the price, and declaring that they were done and provided "up to the 21st of November last," and by contract, *Held*, that it was a compliance with the requirements of the mechanic's lien law, in a case where the lien is claimed for work and materials done and provided by contract. Certainty to a common intent is all that is required in such a case.

6. When the appropriation of money on different contracts, some of which are *ultra vires*, is made by the debtor himself, the payment is valid notwithstanding the existence of the legal objection to the contract under which the work was done, and to which the money was applied.

7. A mortgage of after-acquired property can only attach itself to such property in the condition in which it comes to the mortgagor's hands. If it is already subject to mortgages or other liens, the general mortgage does not displace them, though they may be junior in point of time. It only attaches to such interest as the mortgagor acquires.

8. The claim of employes of a railroad company under the second section of the act "for the relief of citizens on the line of any railroad that has or may hereafter fail to operate", will, where the property is subject to encumbrance existing when the act became a law, be subject to such encumbrance.

9. Where no return was made of the cost of the property whereon the tax was payable to the state, under the second section of the act "to establish just rules for the taxation of railroad companies, and to induce their acceptance and uniform adoption," approved April 2d, 1873, there can be no lawful claim of the tax.

---

Bill to foreclose. On final hearing on pleadings and proofs.

Williamson *v.* N. J. Southern Railway Co.

*Mr. B. Gummere*, for complainant.

*Mr. L. Abbett* and *Mr. R. Wayne Parker*, for lien claimants.

*Mr. J. Vanatta*, attorney-general, for the state and for the Lackawanna Coal and Iron Company.

*Mr. R. Allen, Jr.*, *Mr. Trafford*, and *Mr. J. E. Lanning*, for the employes of the railroad company.

*Mr. John Linn*, for the Lehigh Car Manufacturing Company.

THE CHANCELLOR.

The question as to the character of the rolling stock mortgaged to the complainant, whether it is personal property, or is to be regarded as real estate, as between mortgagees whose mortgage has not been filed, and execution creditors who have levied on the mortgaged property, is raised by the Lackawanna Coal and Iron Company, who recovered a judgment in the supreme court of this state against the railroad company for $42,285.68 on the 19th of January, 1874, and subsequently caused levies to be made, under executions issued thereon, upon the rolling stock. The rolling stock is covered by the complainant's mortgage. That mortgage, though recorded, was not filed as a chattel mortgage, nor was delivery made to or possession taken by the mortgagees immediately after the mortgage was made, nor, indeed, until the 1st of January, 1874, at the earliest. The judgment creditors above mentioned insist that the rolling stock is personal property, and that inasmuch as the complainant's mortgage was not filed according to the provisions of the act " concerning mortgages," (*Rev.* p. 708,) and was not accompanied by immediate delivery of the rolling stock, followed by actual and continued change of possession, it is, under that act, abso-

lutely void as against them. The question just raised has, during many years past, been from time to time presented to the courts for adjudication, with different results. The history of the treatment of the question, and the course of the decisions and legislation upon it, are familiar. They are well presented by Judge Green, in his edition of *Brice's Ultra Vires*, (*see* p. 681, &c.,) and other writers of text-books deal with the subject. In this state, the question has never been authoritatively passed upon, nor has it come up for adjudication, and there is no special legislation on the subject. The railway and the cars, with the engines by which they are drawn, together constitute a means by which the power of steam is applied to the purposes of transportation of passengers and freight. The substructure of the road-bed and the track, with the engines and cars specially adapted thereto, and fitted to roll upon it, together constitute but one machine for those purposes. The track, though merely laid upon the ground, is by common consent regarded as real estate. The engines and cars provided by the owners of the road to run thereon, and without which the track is a valueless part of the machine, are not only indispensable to it, but must be regarded as part and parcel of it, and, therefore, partaking of its character. That railroad cars intended for and placed upon a railroad, may be used on any other road of the same gauge, does not militate against this proposition. If it did, the fact that a bell in a factory may be used elsewhere; that the stones in a mill may be used in any other mill of the like character; that the doors and shutters of a house may be used in the construction of any other house, and that fixtures in a factory may be made available in many other factories even of a different character, would have been sufficient to have led the courts to a different conclusion from that at which they have arrived as to the character of such articles in connection with real property. Says *Sheppard's Touchstone*, p. 90 : That which is parcel, or of the essence of the thing, although at the time of the grant it be actually severed from it, doth

pass by the grant of the thing itself; and, therefore, by the grant of a mill the millstone doth pass, albeit at the time of the grant it be actually severed from the mill; so, by the grant of a house the doors, windows, locks and keys do pass as parcel thereof, albeit at the time of the grant they be actually severed from it."

There is obviously no force in the argument that there is no necessary connection between railroads and the engines and cars used thereon, seeing that there are railroad companies which own railroads but no engines or cars, and whose railroads are used by the engines and cars of other companies only. The relation of the cars to the track, their special adaptation to it, and the intention of their owners, where they are also the owners of the track, that they shall be used upon it, are considerations which outweigh the suggestion that a railroad car and a locomotive engine, by themselves considered, are of course personal property. So are the stationary engine or the machine in the machine shop or place of sale, and the belting in the store where it is sold. Property which would otherwise be chattels becomes real estate merely by attachment, by annexation, actual or constructive, for use in connection with the real property to which it is attached. In no other way is its character changed. If, as in the case before me, the owners of a railroad, intending to use it themselves for the purposes for which it was designed, shall themselves supply it with engines and cars necessary for, and therefore adapted to such use, with the intention of using those engines and cars thereon accordingly, the engines and cars may well, under such circumstances as this case presents, be regarded as part and parcel of the railroad. Said Justice McLean, in *Coe* v. *Pennock, C. C. U. S.* for the Northern District of Ohio, reported in 2 *Redfield's Am. Rail. Cases*, 667: "The railroad, like a complicated machine, consists of a great number of parts, a combined action of which is essential to produce revenue. And as well might a creditor claim the right to levy on and abstract some essential part from

Woodworth's planing machine, or any other combination of machinery, as to take from a railroad its locomotives or its passenger cars. Such an abstraction would cause the operation to cease in both cases."

The criterion by which the question as to whether a thing which in its nature is personal property is a fixture or not, has been said by the supreme court of this state, and by this court, to be the united application of the following requisites: Actual annexation to the realty or something appurtenant thereto; application to the use or purpose to which that part of the realty with which it is connected is appropriated; the intention of the party making the annexation to make a permanent accession to the freehold. *Brearley* v. *Cox*, 4 *Zab.* 287, 289; *Crane* v. *Brigham*, 3 *Stock.* 29; *Quinby* v. *Manhattan Cloth & Paper Co.*, 9 *C. E. Gr.* 260, 266; *Rogers* v. *Brokaw*, 10 *C. E. Gr.* 496; *S. C., on appeal, sub nom. Blancke* v. *Rogers*, 11 *C. E. Gr.* 563. That it is not necessary that the annexation be by actual attachment to the freehold, is too obvious for illustration. The cases of keys to locks, rails laid loosely in a fence, a statue standing in a niche made for its reception in the wall of a house, a statue standing on a pedestal in a field, wild deer in a park, fishes in a pond, rabbits in a warren, doves in a dove-house, and many other illustrations, at once present themselves. *Stockwell* v. *Campbell*, 39 *Conn.* 362; *Snedeker* v. *Warring*, 12 *N. Y.* 170, and *Quinby* v. *Manhattan Cloth & Paper Co.*, *ubi supra*, may be referred to as cases in which merely constructive annexation was regarded as sufficient. The cases on this point are collected in Mr. Ewell's recent work on fixtures. As was said in the case last cited, the permanency does not depend so much on the degree of physical force with which the thing is attached as upon the motive and intention of the party attaching it. To the same effect *Blancke* v. *Rogers*, 11 *C. E. Gr.* 563, 568. If the engines and cars were designed to slide upon the rails, there would probably be no question raised as to their character; it would be conceded that they are part of the realty. The

fact that, instead of sliding, they are designed to move on wheels attached to the platforms on which they rest, and which constitute part of them, can make no difference in the principle. In either case they are attached to the track and adapted thereto to be moved thereon. The flanges of the wheels confine the cars and engines to the track, on which they must run and which they are not to leave. If they leave it, they usually do so to their destruction. Of the intention in this case to annex (using the term in a technical sense) the cars and engines to the track, there is the most abundant evidence. The mortgage shows it. It is obvious, too, from the character of the property and its relation to the railroad. These latter considerations are of great importance in that connection. Said the court in *Blancke* v. *Rogers, ubi supra:* " The *nature of this property* and *its relation to the mortgaged premises* are not such as to justify the conclusion that the mortgagor *had any intent to annex* these chattels and *make them a permanent accession* to the freehold ; the mortgage contains no evidence of such intent." The principle on which the conclusion at which I have arrived upon this subject is based, has been recognized by the federal courts, in the Circuit Court of the United States for the Northern District of Ohio, in *Coe* v. *Pennock, ubi supra ;* by the United States Supreme Court, in *Gue* v. *Tidewater Canal Co.,* 24 *How. S. C.* 257 ; in *Minnesota Co.* v. *St. Paul Co.,* 2 *Wall.* 609 ; in *Railroad Co.* v. *James,* 6 *Wall.* 750, and in the Circuit Court of the United States for the District of Kansas, in *Farmers Loan & Trust Co.* v. *St. Josephs & Denver City R. R. Co.,* 3 *Dillon* 412. The last mentioned case was decided in 1875, and presented the very question now under consideration, under the same circumstances. The opinion was delivered by Mr. Justice Miller, and was fully concurred in by Judge Dillon. Justice Miller there said, that after having taken time to consider the question, his judgment was that it was not necessary as to the rolling stock to record the instrument as a chattel mortgage ; that as to that, it was sufficient even as to creditors that the mortgage .

was duly registered as a mortgage of real estate. He added that in his opinion rolling stock and other property strictly and properly appurtenant to the road are part of the road, and that they were covered by the mortgage in question, which in its terms embraced rolling stock. He further says: "The cases are conflicting upon the point as to the nature of rolling stock, but, considering the particular character of a railroad, the true principle is the one above stated." The views which I have expressed are applicable to the station-houses, engine-houses and freight-houses, and the work-shops of the company, with their appurtenances, and also to the piers and wharves and their appendages; to the water tanks and other property of a like character levied on by the judgment creditors. All such property is covered by the terms of the mortgage, and is part of the realty. Not so the tools and implements, the furniture of the station-houses, or any other property of a personal character which is such as is commonly used for other than railway purposes. *Far. Loan & Trust Co.* v. *St. Josephs & Denver City R. R. Co.*, *ubi supra*.

The mortgagees, according to the terms of the mortgage, were to remain in possession until forfeiture. The rolling stock was mortgaged with the road, and it was fixtures necessary to the operation of the road. Now, if it were conceded that the rolling stock is personal property, its necessary connection with the mortgaged real estate, the necessity which existed to use it in order to use the real estate itself, the peculiar connection between the rolling stock and the road, are of themselves sufficient reasons for holding that the provision of the act concerning mortgages, requiring immediate delivery and continued possession of chattels mortgaged, or filing instead thereof, is inapplicable to such mortgages.

The complainant insists that he had possession of all the property in question at the time when the judgment was recovered, and that, therefore, if the property be regarded as personal property, he is still entitled to it as

Williamson v. N. J. Southern Railway Co.

against the judgment creditors, notwithstanding the fact that the mortgage was not filed. The proof is that the possession of all the mortgaged property was delivered up by the mortgagors to the complainant and his co-trustee (since deceased), as mortgagees, on the 20th of December, 1873, but the business continued to be transacted in the name of the railroad company until the 31st of that month, because of the difficulty of closing the accounts of the railroad before the end of the month. Possession was taken by the mortgagees on the 1st of January, 1874, and the business of the railroad was conducted by them until the 12th of that month, when they were compelled to discontinue it by reason of a strike of the employes upon the road because of non-payment of their wages by the company. The road, from that time to some time in the following February, ceased to be operated, and the chancellor, under an act of the legislature, passed in the last mentioned month, entitled "An act for the relief of citizens on the line of any railroad that has or may hereafter fail or neglect to operate," (P. L. 1874, p. 12,) appointed a receiver to operate the road, who took possession thereof and operated it accordingly until the 1st of May following, when, on the petition of the complainant that he might be permitted to resume the possession, possession was given to him by the order of this court. The act concerning mortgages provides that every mortgage or conveyance intended to operate as a mortgage of goods and chattels thereafter made (the act was approved March 24th, 1864, Rev. p. 708), which shall not be accompanied by an immediate delivery and followed by an actual and continued change of possession of the things mortgaged, shall be absolutely void as against the creditors of the mortgagor and as against subsequent purchasers and mortgagees in good faith, unless the mortgage, or a copy thereof, shall be filed as directed in the second section of the act. The provision of the act as to delivery and possession is clear and explicit. The legislature intended that notice of the existence of a mortgage of chat-

tels should be necessary to its validity as against creditors and *bona fide* purchasers or mortgagees, and that that notice should be by immediate delivery to and actual possession by the mortgagee of the things mortgaged, or, where the mortgagor was to remain in possession, by filing the mortgage in a public recording office, the office of the county clerk or register of deeds, where the office of register exists. The mischief was the facility with which debtors protected their property from their honest creditors by means of secret mortgages of their goods and chattels, after obtaining credit on the faith of their ownership of them. The remedy intended to be applied was to require mortgagees of chattels to take open possession thereof at once on the delivery of the mortgage, and retain it continuously, keeping the mortgaged property in their hands until their mortgage claim upon it should have been satisfied; or, if that should not be done, to require them to give public notice, by filing, of the existence of the mortgage. The fact that the mortgagee has taken possession before the creditor recovered judgment, will not give validity to a chattel mortgage which has not been filed, and where possession was not taken on the delivery of the mortgage. The complainant's mortgage, therefore, as to the things mortgaged which are personal property, is void as against the judgment creditors.

The Lehigh Car Manufacturing Company, in July and August, 1873, sold and delivered to the New Jersey Southern Railroad Company seventy-five box cars, at the price of $805 each, under a written contract between the two companies, dated April 7th, 1873, by which the car company agreed to build one hundred cars for the railroad company, to be delivered at Wilmington, Delaware; the price, in the language of the contract, to be payable on delivery of each twenty-five cars, in the notes of the railroad company, at four months, with interest, with first mortgage bonds of the railroad company, at seventy per cent., as collateral security. Of the cars mentioned in the agreement, seventy-five were delivered at Farmingdale, in this state, the place designated

by the parties for the purpose, subsequently to the making of the agreement. The remaining twenty-five were manufactured, but were not delivered, because of the insolvency of the railroad company at the time when they were ready for delivery. The receipt for the twenty-five which were first delivered, is for $19,477 (freight to Farmingdale being deducted), and is dated on the 18th of August, 1873. The receipt for the fifty cars is for $25,913.28, and is dated September 4th, 1873. These last-mentioned cars appear, by a memorandum on the railroad company's voucher, to have been delivered on the 27th of August preceding. From the amount of the price of the seventy-five cars the railroad company deducted freight to Farmingdale, and also $13,200.72 for alleged deficiency in the quality of the wheels of the cars. For the amount mentioned in the receipt of August 18th, four notes, for $5,040.14 each, were given, with twenty-nine bonds, called consolidated first mortgage bonds. These notes were made by the railroad company, and included interest for the time they were to run. For the amount receipted for on the 4th of September, five notes, made by the company, for $5,365.54 each, were given. These notes were payable at six months after date, and included interest from their date to the time of their maturity. As collateral to them the railroad company delivered to the car company thirty-nine bonds of the same sort as those above-mentioned, given to secure the former notes. No other security than the bonds was given for any of the notes. The notes which were given on the 18th of August matured on the 21st of December, 1873, and the others on the 7th of March, 1874. On the 20th of December, 1873, the railroad company, having become insolvent, delivered possession of their railroad and rolling stock as before stated, to the trustees of the first mortgage bond holders. None of the notes were paid. For the amount, $13,200.72, retained for alleged deficiency in the quality of the wheels no payment was ever made or note given. The railroad company appear to have become satisfied with the quality of the wheels, and in November,

1872, Mr. Serat, the superintendent, offered to give to the car company the notes of the railroad company for the $13,200.72, but the car company declined to receive them without collateral security, and that the railroad company could not give.

The wheels of the cars were furnished by the Taylor Iron Works Company, under an agreement between them and the car company, by which they agreed to take in payment for them the same securities, principal and collateral, in which the car company were to receive payment for the cars under the contract between them and the railway company. For the wheels furnished for the twenty-five cars first delivered they received from the car company in payment the notes of the railroad company, with their proportion of the collaterals. After the fifty cars had been delivered, the car company were informed that the bonds which they had received as collateral to the notes given for the price of the twenty-five cars, were not first mortgage bonds of the railroad company, and after the settlement on the 4th of September had been made, the president of the car company, who had acted for them in that settlement, stated to the secretary (who was also auditor) of the railroad company that he had been informed that those bonds were not first mortgage bonds, but the secretary assured him that they were, indeed, such. In November, 1873, the car company and the Taylor Iron Works Company having ascertained that the bonds, so far from being first mortgage bonds of the railroad company (which were a good security), were entirely worthless, the president of the car company thereupon determined to come to this state to demand the return of the cars, but was prevented by the illness of his wife from so doing. The president of the iron works company, however, came and made a demand on the railroad company for the return, because of the fraud in the securities, of the wheels which his company had furnished. This demand was refused. Subsequently, in the latter part of January or early in February following, the attorney of the car company made a demand on the complainant in this suit, then mort-

gagee in possession, for the return of the cars, tendering to him at the same time all the notes and bonds. When the demand was made by the president of the iron works company no tender of either the notes or bonds, was made. The car company, after the demand made by them, brought an action of replevin to recover the cars. This suit was then pending, and that action was therefore restrained by this court, and the litigation transferred to this forum. The complainant insists that the car company cannot be permitted to rescind the contract of sale and retake the cars, because they did not elect to do so within a reasonable time. The delivery of the cars and the delivery of the notes and mortgages as security for the price were by the terms of the contract to be simultaneous. Where payment and delivery are agreed to be simultaneous and payment is omitted, evaded or refused by the vendee upon getting possession of the goods, the seller may immediately reclaim them. *Chitty on Contr.*, 11*th Am. Ed.* 538. "It is not necessary," say the court in *Whitwell* v. *Vincent*, 4 *Pick.* 449, "in order to make the delivery conditional, that an express declaration should be made to that effect at the time of delivery. It is sufficient if enough appears to show that such was the understanding of the parties." See also *D' Wolf* v. *Babbett*, 4 *Mason* 289, and *Haggerty* v. *Palmer*, 6 *Johns. Ch.* 437; *Copland* v. *Bosquet*, 4 *Wash. C. C.* 588, and *Hammett* v. *Linneman*, 48 *N. Y.* 399. "If a vendor," say the court in *Harris* v. *Smith*, 3 *S. & R.* 20, "rely on the promise of the vendee to perform the conditions of the sale and deliver the goods absolutely, the right of property will be changed although the conditions be never performed. But where performance and delivery are understood by the parties to be simultaneous, possession obtained by artifice and deceit will not avail. The fraud will vitiate the whole transaction." That the car company were defrauded in the transaction under consideration, there is no room to doubt. They were to receive as collateral security some of the very bonds for the holders of which the complainant is trustee, and the

price of their cars was to be secured to them by the very
mortgage on which this suit was brought. Instead of being
a security to them for the price of their property, it will, if
their claim to rescind be not allowed, be the means by
which their property will be taken without compensation
for the benefit of the first mortgage bond holders. As
before remarked, there is no room to doubt that they were
grossly defrauded in the substitution of what was called the
consolidated first mortgage bonds for the first mortgage
bonds of the railroad company. Mr. Bentley, by whom the
contract was made for the latter company, expressly testifies
that by the first mortgage bonds of the railroad company
was meant exactly what the expression implies; and he tes-
tifies also that the company had such bonds to the amount
of $170,000 when the contract was made. The bonds
given to the car company as such bonds were undeniably
worthless. They were endorsed New Jersey Southern
Railroad Company First Mortgage Consolidated Bonds.
The secretary and auditor of the railroad company, when
inquired of about the character of the bonds, put an end
to the apprehension of the president of the car company
by assuring him that they were indeed the first mortgage
bonds of the railroad company. The bonds purport to
be part of an issue of $7,000,000, the payment of which
is alleged to be secured by a trust deed or mortgage of
even date therewith, made by the New Jersey Southern
Railroad Company to John R. Garland and Walter B.
Palmer, trustees, and conveying to those trustees, among
other things, "the entire railways of the said company
and the consolidated railways running within the states of
New Jersey, Maryland and Delaware, together with the
franchises, privileges, tolls, income, profits and property
of the said company." The bonds further state that the
series represents the only and entire funded debt of the
New Jersey Southern Railroad Company after the bonds
of the said consolidated railroad companies shall have been
exchanged. The consolidation of railroad companies men-

Williamson *v.* N. J. Southern Railway Co.

tioned in the bond never existed. The bonds, therefore, were baseless. Their history is told by Mr. Bentley, by whom the contract with the car company for the cars in question was, as before stated, made on behalf of the railroad company. He narrates a conversation with Jay Gould on the subject. He says : "Mr. Gould—he then was president of the road—instructed me to get up a consolidated bond, I think for seven millions, and provision was made for retiring the outstanding bonds of the company, I think about three millions and a half; I complied with his request, and the text I think, was done by Judge Green; I took it to Mr. Gould, and he interlined a number of railroads—two or three additional railroads—to be mortgaged; I said to him, 'You don't own these roads, and therefore can't mortgage them,' but he replied, that before the bonds would be issued he would obtain them by foreclosure or by an arrangement so that they would go in and be mortgaged.". Mr. Bentley adds that he never knew that the consolidation was perfected. Mr. Morosini, the secretary of the railroad company, says in his testimony that though the bonds declared on their face that they represented the only and entire funded debt of the New Jersey Southern Railroad Company after the bonds of all the "said consolidated railroad companies" should have been exchanged, no arrangements were made for exchanging the bonds. There can be no doubt that had the president of the car company known of the fraud he would have taken immediate steps to recover the property which his company had delivered on the faith of the security.

The sale was clearly conditional, the condition being that the security provided for in the contract should be given simultaneously with the delivery of the property. There is no evidence of waiver. "Waiver," says Chief Justice Shaw, in *Farlow* v. *Ellis*, 15 *Gray* 229, "is a voluntary relinquishment or renunciation of some right, or foregoing or giving up of some benefit or advantage, which, but for such waiver, the party relinquishing would have enjoyed.

It may be proved by express declaration, or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage, or by a course of acts and conduct, or by so neglecting and failing to act as to induce a belief that it was his intention and purpose to waive. Still, voluntary choice is of the essence of the waiver, and not mere negligence; though from such negligence, unexplained, such intention may be inferred." In this case there is not only no evidence of any waiver of the security provided for in the contract, but there is, on the other hand, positive evidence to the contrary; inquiry based on statements which had come to the ears of the vendors of the true character of the bonds, and that, too, after they had been received by the car company as security for $46,988.26, no part of which had been paid. The bonds were received on the belief that they were genuine first mortgage bonds. After they had been so received the railroad company quieted the apprehension of the car company by assuring them of their genuineness. The president of the latter company testifies that Mr. Morosini, the secretary of the railroad company, satisfied him that the bonds were the first mortgage bonds, and he was satisfied that they were safe. He adds that he believed Mr. Morosini, that his statements were correct, and went away relieved in his mind. Very shortly afterwards the railroad company became insolvent. In November it had no security to give for the $13,200.72 retained for the alleged deficiency in the quality of the car wheels, and in the latter part of December its railroad, with its appurtenances, passed out of its control into the hands of the trustees of the first mortgage bond holders.

The delivery of the cars was by the agreement, as modified, to be at Farmingdale. They passed into the hands of the railroad company by no other delivery of possession than that contemplated by the agreement, which also provided for the security for the price simultaneously with the delivery.

Williamson v. N. J. Southern Railway Co.

In *Clough* v. *The London & N. W. Railw. Co.*, *L. R.* (7 *Exch.*) 26, it was held in a case in many respects similar to this, that under such circumstances the property passed by the contract of sale; that the contract was not void, but only voidable at the election of the fraudulent vendor; that he had the right of this election at any time after knowledge of the fraud, until he had affirmed the sale by express words or unequivocal acts; that he might keep the question open, as long as he did nothing to affirm the contract, and that so long as he had made no election, he retained the right to avoid it, subject to this: that if, while he was deliberating, an innocent third party had acquired an interest in the property, or if, in consequence of his delay, the position even of the wrong-doer was affected, he would lose his right to rescind; that his election in that case was properly made by a plea claiming the goods, on the ground that he had been induced to part with them by fraud, and that there was no necessity for any antecedent declaration or act *in pais*, and that the vendor was not bound in his plea to tender the return of money, and an acceptance which he had on the sale received, on account of the purchase money, from the plaintiff's confederate in the fraud, who bought the goods and caused them to be sent to the plaintiff; because the money was received, not of the plaintiff, but of the confederate, who was not a party to the action. In the case before me, the election, though it was not made until the demand and tender in January or February, 1877, was not too late. Nor was the railroad company in anywise prejudiced by the delay in electing. The bonds given to the car company were of no value. The fact that the car company had the railroad company's notes, did not, in any wise, injuriously affect the railroad company. In fact the latter company has never paid anything whatever for the cars. The cost price was nearly $60,000. Nor does it appear that any innocent third party acquired any interest in the property while the car company were deliberating. If not, there is no reason why relief should not be granted

to that company. The cars were delivered between the 15th of July and the 22d of August (both days inclusive), 1873. The debt of the Lackawanna Coal and Iron Company was, as appears by their answer, contracted some time in the summer of 1873, but at what particular time it does not appear. Mr. Morosini testifies that when the bonds were given to the Lehigh Car Manufacturing Company the railroad company had none of the first mortgage bonds, and had not had any since the first of May, 1873. They had, therefore, all been negotiated before the transactions under consideration took place. Besides, the Lackawanna Coal and Iron Company and the first mortgage bond holders stand in the place of the railroad company, and any claim they may have to or upon the property is subject to the vendor's lien.

Messrs. A. P. Berthoud & Co. claim a lien prior to the mortgage of the complainant, under the provisions of the "Act to secure to mechanics and others payment for their labor and materials in erecting any building," (*Rev.*, p. 447,) for work and materials done and furnished by them in building for the New Jersey Southern Railroad Company, docks, wharves and piers, and a bridge and floats at the terminus of the Long Branch and Sea Shore Railroad on Shrewsbury river, a navigable river of this state, at Sandy Hook. The work was done under a contract between them and the Southern Railroad Company, made in May, 1873. It was completed on the 21st of November following. The lien claim was filed on the 23d of July, 1874, and summons was issued thereon on the 16th of October following, against the Southern Railroad Company as builders, and the Long Branch and Sea Shore Railroad Company as owners. The lien is claimed under the tenth section of the act, by which the lien given by the act as it stood originally was extended to all docks, wharves and piers erected upon any navigable river in this state, and to the lots of land in front of which such docks, wharves or piers may be erected, and to all the interest of the owner or owners of such land in the soil or

waters of such navigable river in front of those lands, for all debts contracted by the owner or owners thereof, or by any other person with the consent of such owner or owners, in writing, for work done or materials furnished for or about the erection or filling in of such docks, wharves or piers. *Rev.* p. 670, § 10. At the time of making this contract the Southern Railroad Company were in possession of the Long Branch and Sea Shore Railroad, and under the power given to them by act of the legislature, had effected substantially a consolidation of the two companies. So that the railroad of the Long Branch and Sea Shore Company and its appurtenances were, in fact, in equity the property of the Southern Company. Their ownership was only equitable, however. The legal title to the property still remained in the Long Branch and Sea Shore Company. The Southern Company took possession of the Long Branch and Sea Shore road in June, 1870, and operated it on their own account and as their own property from that date to December 31st, 1873, at or about which time the trustees for the first mortgage bond holders took possession. In order to preserve the integrity of the subject of the litigation in this suit until this court could pass upon the various conflicting claims thereon, the proceedings at law to enforce the lien claim were stayed by injunction of this court on the filing of the supplemental bill in this cause. The question of the validity of the lien claim is therefore to be adjudicated upon here. Various grounds of objection to the claim are urged. It is insisted that it is invalid because the bill of particulars does not state the time when the work was done or the materials provided. The amount demanded by the lien claim is $59,696.76, besides interest. Of this amount all but $396.53 is for work done and materials provided under the contract. The items of the claim of $396.53 are given with all the particulars required by the statute. As to the contract work and materials, the claim states that they were done and furnished by contract "within a year last past," and the bill of particulars sufficiently particularizes the amount

and kind of labor performed and materials furnished (stating the price), and declares that they were done and provided up to the 21st day of November, 1873, and in that connection states that the work was done and the materials furnished by contract, at the prices mentioned in the bill of particulars.   The statement thus made is a compliance with the requirements of the mechanic's lien law, in a case where the lien is claimed for work done and materials furnished by contract.   The act provides that in such case "the bill of particulars need not state the particulars of the labor or materials, further than by stating generally that certain work therein stated was done by contract at a price mentioned."   In *Associates of the Jersey Company* v. *Davison*, 5 *Dutch.* 415, 421, the court recognizes the wide distinction in the respect under consideration between the requisites of a bill of particulars, where the work was done or materials provided by contract, and its requisites in a case where there was no contract.   Under the mechanic's lien law of Pennsylvania, (*Act of June* 16*th*, 1836, § 12,) which required that one who filed a lien claim for materials or work should set forth in it the time of delivering the materials or doing the work, it was held that where the work was done or the materials furnished under an entire contract, the different times when the work was performed or the materials delivered need not be stated, but that one date was sufficient, and the claim would be good if the evidence proved that the completion of the contract was within six months from the time when the claim was filed.   *Fourth Baptist Church* v. *Trout*, 28 *Pa. St.* 153.   Certainty to a common intent is all that is required in such case.   Besides, in this case, if more particularity were required, an amendment of the lien claim would be permitted, under the provisions of the fourteenth section of the act.   *Rev.* p. 671.   The complainant has had full knowledge, from the testimony in the cause, of the particulars of the claim, as fully as they can be furnished. The summons was issued within one year from the time when the last work was done.   That appears, by the bill of

particulars, to have been done on the 21st of November, 1873, and the summons, as before stated, was issued in July, 1874.

Besides the construction at Sandy Hook, the contract provided for other works—a bridge and float on the Delaware, at Smyrna, in the state of Delaware, the terminus of the Smyrna and Delaware Bay Railroad, and a bridge and float at Bayside, the terminus of the Vineland Railroad. The complainant insists that these latter works were *ultra vires,* and that none of the payments made on account of the contract can lawfully be appropriated to payment therefor. But it appears that the Southern Company, in making payments to the contractors, took receipts from them for the money as having been paid on account, without designating in the receipts the work to which it was to be applied, and the company themselves made appropriation of the money. In such case, where the appropriation is by the debtor, the payment is valid, notwithstanding the existence of legal objection to the contract under which the work was done, to the payment for which it was applied. *Story's Eq. Juris.,* § 459b; *Rohan* v. *Hanson,* 11 *Cush.* 44. A further objection is made. that the lien is invalidated by a misstatement as to the amount due on the claim. The act provides that any willful or fraudulent misstatement of any of the matters required to be inserted in the bill of particulars shall discharge the premises from the lien. I see no evidence of any willful or fraudulent misstatement in this case. There is a misstatement, however. A large sum of money which was paid on account of the work and materials, and which should have been credited, has not been credited; but this is evidently due to a want of knowledge as to the appropriation of the payments made on the contract. It is further insisted by the complainant that there is no evidence of the written consent of the legal owner, the Long Branch and Sea Shore Railroad Company, to the work at Sandy Hook, which consent is, under the act, necessary where the work is not done by the owner. *Rev.* 670, § 10.

That company, however, admit, by their answer, that the work was done by their consent. The objection does not come from them, but from the mortgagee of the Southern Railroad Company. The provision of the mechanic's lien law, which requires the written consent of the owner, is for the protection of the owner. It is a defence to him. It is not, and of course ought not to be, a defence to the builder. The complainant insists that the lien, if it exists, is subsequent to the encumbrance of his mortgage on the premises. That mortgage, indeed, bears date and was recorded before the work and materials were done and provided, and it embraces the property in question, but it is merely as after-acquired property. The record of the mortgage was no notice to Messrs. Berthoud & Co. They had no actual notice. The mortgage, of course, did not in terms cover this property specifically nor by any description. The mortgagors did not, when the mortgage was made, own it, nor, as far as appears, even contemplate acquiring it. And again, it would be the most obvious injustice to give to the mortgagees in this case, under these circumstances, priority of lien over the mechanic's lien claimants. A mortgage intended to cover after-acquired property can only attach itself to such property in the condition in which it comes into the mortgagor's hands. If it is already subject to mortgages or other liens, the general mortgage does not displace them, though they may be junior in point of time. It only attaches to such interest as the mortgagor acquires. *U. S.* v. *New Orleans R. R.*, 12 *Wall.* 362. Here, indeed, the lien is claimed for improvements put upon the property after the mortgagor acquired the property, but such acquisition was not by grant of the property but by obtaining a controlling interest in the capital stock of the company owning the property. The lien claimants are entitled to priority over the complainant's mortgage for the amount due on their claim, with costs, including the costs of their proceedings at law.

Rufus Blodgett, James M. Quinby and William J. Parmentier, as trustees for the employes of the New Jersey Southern Railroad Company, to whom that company were indebted for wages when the strike above mentioned took place, by their answer claim a lien for those wages (but not to exceed in any case two months' wages) under the provisions of the second section of the before-mentioned act "for the relief of citizens on the line of any railroad that has or may hereafter fail or neglect to operate." That section provides that whenever the chancellor shall appoint a receiver of any railroad company, said receiver shall apply all unencumbered personal effects and all moneys which may be transferred to him at the time of entering upon his duties as such receiver, to the payment of wages at that time due the employes of said company, and the chancellor may from time to time make such orders as he may deem proper to equitably carry out the provisions of that section; provided, that no such payments shall be made for more than two months' wages. The act was approved on the 12th of February, 1874, and took effect immediately. *P. L.* 1874, p. 12. Under that act William S. Sneden was appointed receiver in February, 1874. Previously to that time (on the 26th of December, 1873,) Robert F. Stockton was appointed receiver under the act "to prevent frauds by incorporated companies." It does not appear that any money was transferred to either of the receivers at the time when he entered on the duties of his office. It is claimed, in behalf of the employes, that unencumbered personal effects within the meaning of the act were transferred to the receivers, and that they ought to have applied them to the payment of the wages due to the employes. They further insist that the balance, which it is said remained in the hands of Mr. Sneden when he was discharged from his receivership, and which he paid over to the complainant, ought to have been applied by him to the payment of the wages, and that it ought now to be so applied. They also claim that the lien extends to the moneys received by Mr. Stockton, receiver,

from the United States Government, after his appointment, for mail service previously rendered by the railroad company. It will be seen that the lien given by the act is, by the terms of the act, upon the money and unencumbered effects transferred to the receiver at the time of entering upon the duties of his office. The only question on this subject which is pertinent to this suit is, whether the employes are entitled to a lien upon any of the property which the complainant claims under his mortgage. Of the property which has already been under consideration, no part would be subject to such lien except that which has been held not to be covered by the complainant's mortgage. And as to that, the Lackawanna Coal and Iron Company had under their executions a levy upon it when the act of February 12th, 1874 was passed. The lien of the employes, therefore, is subsequent and subject to the lien of that company for the amount of their debt upon their judgment and executions. And the employes have, by virtue of the act, a lien for their wages (not exceeding two months' wages in any case) due to them at the time when Mr. Sneden entered on his duties as receiver, subject to the lien of the Lackawanna Coal and Iron Company's levy. The lien of the employes cannot be extended beyond the provisions of the act, which, though it will receive a reasonable construction, cannot, of course, be so construed as to diminish or impair the obligation or lien of the levy of the coal and iron company or the lien of the complainant's mortgage.

A claim is made on behalf of the state for unpaid taxes upon the property of the Southern Railroad Company for the years 1873, 1874 and 1875, with interest thereon. It is made under the act " to establish just rules for the taxation of railroad corporations, and to induce their acceptance and uniform adoption," approved April 2d, 1873. P. L. 1873, p. 112. That act provided that all taxation upon all railroad companies occupying and using railroads in this state, whether as lessees or otherwise, should thereafter be made as follows: First, such companies should pay upon the cost, equipment

and appendages of their railroads, respectively, a state tax after such rate of taxation as might have theretofore been fixed by law upon such companies, or in default thereof after the rate of one-half of one per cent. upon such cost. It provided that on or before the first day of January in each year, the president of every railroad corporation should, on oath or affirmation, make return to the comptroller of this state of the cost of the road, and cost of the equipment and appendages of the road, used by or belonging to the corporation in this state, specifying the items and locality thereof, and further showing the cost of said property whereon said state tax was laid, specifying its particular items and their cost; and that thereupon, within ninety days after such return, payment of the tax should be made by the company to the state treasurer, and in default of such payment remedy might be had therefor by suit. It further provided that if the comptroller should be dissatisfied with the statement and return, he might, within six months from the time of making such statement and return to him, but not afterwards, bring suit in the supreme court, in the name and for the use of the state, against the corporation making the return, as for a false return, and might recover in the action, upon proof thereof, the tax due upon any property or cost omitted or erroneously stated. In December, 1873, the railroad of the Southern Railroad Company was, with its appendages and appurtenances, delivered to the complainant as mortgagee, and was actually taken into his possession in January, 1874, accordingly. He retained possession thereof, as before stated, until the strike in February following, and resumed possession by leave of this court on the first of May, 1874, and he has been in possession as mortgagee ever since. No statement or return was made by the president of the company in either of the years, in respect of which the tax is claimed, nor has any been made by the complainant since he has been in possession. On or about the 26th of December, 1873, a receiver of the company was, as before stated, appointed by this

court under the act "to prevent frauds by incorporated companies," and that appointment is still in force. At that time the company were enjoined from doing any corporate act or exercising any of their franchises, and the injunction has never been dissolved. The receiver made no statement or return to the comptroller, nor was any application made to him therefor or to this court (whose officer he was) in that behalf. The claim made in behalf of the state is based merely upon a computation of the tax of one-half of one per cent. on the aggregate amount of the capital stock of the company and first mortgage bonds. It is insisted on behalf of the state that the rate of tax having been fixed by the legislature, and it having been the duty of the corporation, or those who claimed its property and franchises, to make the annual statement and return of the cost of the railroad and its equipment and appendages, their failure to discharge that duty could not absolve the property from the liability to pay the tax, and the state may, therefore, justly assume that the capital stock and first mortgage bonds represented that cost, and may lawfully require payment of the tax accordingly. Taxation is an arbitrary act of sovereignty by which the citizen is compelled to make contribution to the expenses of government. The laws by which it is imposed, while they receive a reasonable construction, are construed with reasonable strictness also. The law, in the interest of the property owner and for his just protection against illegal exactions, requires that the modes provided by enactment for imposing and collecting the tax shall neither be disregarded nor essentially departed from, but shall be observed. The tax under the law of 1873 was, according to the express provision of the law, to be levied upon the cost of the railroad and its equipment and appendages. The amount of that cost was to be fixed, not by the comptroller, but by the president of the company, and the only remedy given by the act for false statement was an action in the name and for the use of the state, as for a false return. None was given for failure

to make a return.   For non-payment of the tax within the
time limited by the act, the only remedy was by suit.   The
taxation was against the company.   The act declared no lien
for the tax on the property of the company.   If the president
of the company failed in his duty to make the return, the
remedy must have been by *mandamus* to compel him to make
it.   If there was no president, or officer discharging his func-
tions, against whom proceedings to compel a return might
have been directed, and there was, therefore, a failure of
remedy, the fault was in the legislation.   In the case of the
insolvency of the company, and proceedings thereupon, and
consequent prohibition from the exercise of corporate powers,
and the transfer of the custody and management of their
property and franchises by order of this court to a receiver,
application to this court might have been made for relief in
the premises.   But where, as in the present case, possession
was taken by the mortgagee, this court had no control over
the matter, and the state was necessarily left to the conse-
quences which flowed from the defective legislation.   These
defects have been, to a great extent at least, remedied by the
act of 1876, " providing for state taxes on .railroads, and the
more efficient collection thereof."   *P. L.* 1876, p. 129.
The provisions of that act render more manifest and unde-
niable the defects of that of 1873.   The claim made in behalf
of the state in this case is avowedly based on a valuation not
made in conformity with the requirements of the law.   The
state itself, by its officers, attempts to fix for itself a valuation
upon the property of the taxpayer, in respect of taxes claimed
for years past, but never, in fact, levied.   It assumes that the
cost of the road and its equipment and appendages was the
amount of the capital stock and the first mortgage bonds.
There is no warrant of law for such an assumption.   But,
beyond that, there is no authority for the fixing of the amount  .
of the cost by the comptroller at all.   The law declared how
and by whom that should be fixed.   It declared also when
the tax should be levied.   The claim made in behalf of the

state for tax for 1873, 1874 and 1875 cannot be allowed. No tax has been levied. The absence of a necessary element to the imposition of the tax—the statement of the cost—is fatal to the validity of the claim.